J-S28001-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JAROD CAGER, | |
| Appellant | No. 1994 WDA 2014 |

Appeal from the Judgment of Sentence June 16, 2014
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0013713-2011

BEFORE:  OLSON, MOULTON and STRASSBURGER,* JJ.

MEMORANDUM BY OLSON, J.:                    **FILED AUGUST 25, 2017**

Appellant, Jarod Cager, appeals from the judgment of sentence entered on June 16, 2014 in the Criminal Division of the Court of Common Pleas of Allegheny County, as made final when the trial court denied Appellant's post-sentence motions on October 30, 2014.  We affirm.

The factual and procedural history in this case is as follows.  On August 14, 2011, Kiona Sirmons was at the home of relatives on Rochelle Street in Pittsburgh, Pennsylvania.  She was joined by several friends, including Ravin Reid, Montaja Littlejohn, and Valon Pennix.  Sometime later, Sirmons' boyfriend, Antwan Leake, and Jacelyn Terry joined the gathering. Upon arrival, Terry remained in the living room with the other women but Leake went into the kitchen.  According to Detective James McGee, Sirmons stated in an interview on September 2, 2011 that two black males entered

_____

* Retired Senior Judge assigned to the Superior Court.

the residence and proceeded to the kitchen approximately 15 minutes after Leake arrived.[1] After two or three minutes, Sirmons heard multiple gunshots and saw Appellant and Terrel Noaks run from the kitchen and exit the front door.[2] In a recorded statement given to the police on September 9, 2011, which the Commonwealth published to the jury, Sirmons confirmed that she saw Appellant and Noaks exit the home shortly after the shooting. Sirmons also identified Appellant and Noaks in a photographic array.

At trial, none of the women present at the Rochelle Street residence recalled details of the shooting on August 14, 2011, including the identities of any males who entered or left the house other than Leake. Sirmons testified that she previously identified Appellant and Noaks as the shooters because detectives harassed her and visited her at work. She also testified that the police told her who to circle on the photographic array and she denied telling police nicknames used by Appellant and Noaks.

Leake died after sustaining four gunshot wounds during the August 14 attack. Of these, wounds inflicted on Leake's head and chest were deemed capable of causing death. A ballistics expert called by the Commonwealth testified that five shell casings recovered from the crime scene were .40

---

[1] Another detective testified at trial that Pennix met with investigators in February 2013 and said that Appellant was present in the home before Leake's arrival and that he entered the kitchen area after Leake.

[2] Sirmons testified at trial that she grew up with Appellant and that she knew Noaks from her neighborhood.

caliber Smith and Wesson casings fired from a Glock handgun. These casings matched the .40 caliber bullet fragments recovered from the fatal wounds inflicted upon Leake. The Commonwealth also called Tanner Shawl as a witness against Appellant. Shawl testified that in December 2010, approximately eight months prior to the murder, he purchased a .40 caliber Glock handgun on behalf of Appellant. Shawl further testified that Appellant selected the gun and supplied funds to purchase the firearm.

Lastly, the Commonwealth introduced testimony from a witness trained in the field of cellular telephone data analysis. This testimony established that Appellant received four calls from Leake on the day of Leake's murder. In addition, Noaks telephoned Appellant five times on the date of the crime. Four calls from Appellant's telephone on August 14, 2011 between 6:00 p.m. and 8:00 p.m. utilized a cellular tower situated in the same general area as the crime scene and Appellant's mother's residence.

At the conclusion of trial on February 4, 2014, a jury convicted Appellant of first-degree murder, 18 Pa.C.S.A. § 2502(a), and carrying a firearm without a license, 18 Pa.C.S.A. § 6106(a)(1). The jury acquitted Appellant of criminal conspiracy. On June 26, 2014, the court sentenced Appellant to life imprisonment for his murder conviction and a concurrent term of 40 to 80 months' incarceration for carrying a firearm without a license.

Appellant filed his initial post-sentence motion on June 26, 2014 and, thereafter, filed an amended motion on October 24, 2014. The court denied post-sentence relief on October 30, 2014. Appellant subsequently filed a timely notice of appeal on December 8, 2014, after the court reinstated his direct appeal rights. Following several extensions, Appellant, pursuant to Pa.R.A.P. 1925(b), filed a concise statement of errors complained of on appeal on April 26, 2016. The trial court issued its opinion on August 2, 2016.

Appellant raises the following questions for our review:

Whether [Appellant] is entitled to a **Frye**[3] hearing to determine the admissibility of an eyewitness identification expert consistent with the recent holding in **Commonwealth v. Walker**[, 92 A.3d 766 (Pa. 2014)?]

Whether the trial court erred when it admitted evidence concerning a firearm that had been purchased for [Appellant] approximately eight months before the homicide[?]

Whether the trial court abused its discretion when it determined that the verdict in this matter was not against the weight of the evidence[?]

Appellant's Brief at 4.

Appellant's first two claims challenge trial court rulings governing the admission of evidence. The following standards govern our review of such claims.

_____

[3] **Frye v. United States**, 293 F. 1013 (D.C.Cir. 1923).

> The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

***Commonwealth v. Minich***, 4 A.3d 1063, 1068 (Pa. Super. 2010).

In his first claim, Appellant argues that the trial court improperly denied his request for a ***Frye*** hearing to determine whether expert testimony would have assisted the factfinder in assessing eyewitness identification evidence. At trial, none of the Commonwealth's witnesses identified Appellant. Nonetheless, Sirmons' pretrial statements to police identified Appellant as one of two individuals who entered the home before Leake was shot and fled the scene after shots were fired. The court admitted her statements of identification for substantive purposes as prior inconsistent statements pursuant to Pa.R.E. 803.1(1)(B) and (C). Citing ***Walker***, Appellant argues that he was entitled to show how expert testimony would have aided the jury in considering Sirmons' statement since the Commonwealth primarily relied on her identification, which she made following a stressful episode that involved gunfire. In its Rule 1925(a) opinion, the trial court determined that expert testimony regarding eyewitness identification would not have aided the jury in this case since

none of the Commonwealth's witnesses identified Appellant at trial. We conclude that Appellant is not entitled to relief.[4]

In **Walker**, our Supreme Court set aside the *per se* restriction on expert testimony concerning eyewitness identifications. Instead, the Court held,

> We now allow for the possibility that such expert testimony on the limited issue of eyewitness identification as raised in this appeal may be admissible, at the discretion of the trial court, and assuming the expert is qualified, the proffered testimony relevant, and will assist the trier of fact. Of course, the question of the admission of expert testimony turns not only on the state of the science proffered and its relevance in a particular case, but on whether the testimony will assist the jury. Trial courts will exercise their traditional role in using their discretion to weigh the admissibility of such expert testimony on a case-by-case basis. It will be up to the trial court to determine when such expert testimony is appropriate. If the trial court finds that the testimony satisfies **Frye**, the inquiry does not end. The admission must be properly tailored to whether the testimony will focus on particular characteristics of the identification at issue and explain how those characteristics call into question the reliability of the identification. We find the defendant must make an on-the-record detailed proffer to the court, including an explanation of precisely how the expert's testimony is relevant to the eyewitness identifications under consideration and how it will assist the jury in its evaluation. The proof should establish the presence of factors (**e.g.**, stress

---

[4] We reject the Commonwealth's assertion that Appellant waived appellate review of his opening claim. Appellant moved for the appointment of an expert in October 2012, almost two years before **Walker** was decided. In addition, Appellant alleged in his concise statement that the trial court erred in refusing his request to appoint an expert to testify regarding eyewitness identification. The question raised in Appellant's concise statement fairly subsumes the issue he raises on appeal and the trial court had an opportunity to pass upon the present claim during pretrial proceedings. Waiver is unjustified under these circumstances.

or differences in race, as between the eyewitness and the defendant) which may be shown to impair the accuracy of eyewitness identification in aspects which are (or to a degree which is) beyond the common understanding of laypersons.

*Walker*, 92 A.3d at 791-792.

Here, the trial court basically determined that expert testimony would not have aided the jury in assessing the identification evidence offered in the form of pretrial statements. We perceive no grounds to disturb this assessment. As the trial court noted, none of the Commonwealth's witnesses identified Appellant at trial; however, this observation does not lead to our conclusion, as we believe that the factors that make identification of a stranger unreliable apply equally to identifications made within and without the courtroom. Instead, the record here demonstrates that the witnesses at trial retracted their prior statements, told the jury that they did not recall details about the shooting or who was present, and relayed that the events *sub judice* caused them great stress and trauma. Practically speaking, the eyewitnesses here did the work of expert testimony in explaining for the jury how factors such as stress and fear impaired their ability to accurately identify any suspects. In addition, we note Sirmons' testimony that she grew up with Appellant and knew Noaks from her neighborhood. In totality, then, while the events at issue were no doubt stressful (as the eyewitnesses themselves explained to the jury), there are no factors in this case such as a claim of cross-racial identification or identification of unknown individuals that call into question the reliability of

the pretrial statements in a way that could elude the common understanding of laypersons. Under these circumstances, Appellant is not entitled to relief.

In his second claim, Appellant asserts that the trial court erred in admitting Shawl's testimony regarding the purchase of a .40 caliber Glock handgun on behalf of Appellant. Appellant maintains that this evidence was irrelevant and highly prejudicial.

"All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "Evidence is relevant if it logically tends to establish a fact material to the dispute or tends to support a reasonable inference regarding a material fact." *Commonwealth v. Barnes*, 871 A.2d 812, 818 (Pa. Super. 2005). In this case, the court concluded that the challenged evidence was relevant since Appellant's possession of an illegally obtained firearm that matched the bullets at the crime scene, while not dispositive in and of itself, certainly [made] it more likely that he committed the murder." Trial Court Opinion, 8/2/16, at 15. After careful review, we concur with the court's assessment and adopt it as our own. Moreover, we see no basis for Appellant's claim that the introduction of the contested evidence constituted unfair prejudice. Thus, this claim merits no relief.

In his final claim, Appellant contends the verdict was against the weight of the evidence. To support this contention, Appellant points out that no witness testified under oath that Appellant was at the crime scene and

that the ballistic and cellular telephone evidence failed to establish his participation in the murder.

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:
>
>> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. [**Commonwealth v. Brown**, 648 A.2d 1177, 1189 (Pa. 1994)]. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. **Commonwealth v. Farquharson**, 354 A.2d 545 (Pa. 1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

**Commonwealth v. Clay**, 64 A.3d 1049, 1055 (Pa. 2013) (parallel citations omitted).

After careful review and consideration, we conclude that the trial court exercised sound discretion in rejecting Appellant's challenge to the weight of the evidence. **See** Trial Court Opinion, 8/2/16, at 16 (finding that verdicts were not contrary to weight of the evidence where two witnesses identified Appellant and Noaks shortly after killing, witnesses' subsequent retraction was result of witness intimidation, and ballistics and cellular telephone data supported inference that Appellant was in vicinity of crime scene). Accordingly, we adopt the trial court's reasoning as our own and hold that

Appellant's final claim merits no relief. As we rely upon the trial court's opinion in part, we direct the parties to attach a copy of the trial court's opinion of August 2, 2016 to any future filings related to this appeal.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/25/2017

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA             CRIMINAL DIVISION

v.                                       CC No. 201113713

JAROD CAGER

Appeal of:

JAROD CAGER,

　　　Appellant

## OPINION

RANGOS, J.                                        August 2, 2016

On February 4, 2014, Appellant, Jarod Cager, was convicted by a jury of one count of Murder in the First Degree and one count of Carrying a Firearm Without a License.[1] This Court sentenced Appellant on June 16, 2014 to a mandatory term of life without parole on the Murder in the First Degree count, and a concurrent term of 40-80 months incarceration on the Carrying a Firearm Without a License count. This Court denied Appellant's Post-Sentence Motion on October 30, 2014, Appellant filed a Notice of Appeal on December 8, 2014 and, after several extensions of time due to the lack of transcripts, filed his Statement of Errors Complained of on Appeal on April 27, 2016.

---

[1] Appellant was found not guilty of Criminal Conspiracy.

2

## MATTERS COMPLAINED OF ON APPEAL

Appellant alleges eight errors on appeal. Appellant alleges that this Court erred in denying his request for an expert witness to testify regarding eyewitness identification. Next, Appellant alleges this Court erred when it denied his request for information regarding the unsolved shooting death of Jason Daniels. Appellant alleges this Court erred in admitting color autopsy photographs that were more prejudicial than probative. Appellant next alleges this Court erred by permitting the Commonwealth to play a statement of a witness Appellant alleges was led by police. Appellant further alleges that this Court erred in admitting two witnesses' statements which Appellant deems irrelevant, highly prejudicial and of little probative value. Appellant alleges insufficiency of evidence as to both counts as well as alleging that the verdict was against the weight of the evidence. (Statement of Errors to be Raised on Appeal, p. 3-5)

## SUMMARY OF THE EVIDENCE

At trial, Dr. Abdulrezak Shakir of the Allegheny County Medical Examiner's Office, testified as an expert witness in the field of forensic pathology. (Transcript of Jury Trial of January 23-February 4, 2014, Volume I, hereinafter, TT, at 124-125) Dr. Shakir conducted an autopsy on the body of Antwan Leake, the victim in this case. (TT 126) Dr. Shakir testified that the deceased was not under the influence of any intoxicant or drug. (TT 129) Dr. Shakir stated he found evidence of multiple gunshot wounds to Leake: "one to the head, one on the chest, one on the right heel, and evidence of a grazing wound on the neck." (TT 130) Four color photographs taken during the examination of the body were published to the jury over the objection of defense counsel. (TT 133) The bullet wound to the head, in and of itself, was a fatal wound capable of causing death. (TT 137) The bullet to the chest broke several ribs and penetrated both lobes of the left lung, causing massive blood loss. (TT 139) This wound was also capable, in and of itself, of causing death. (TT 141) In contrast, the

3

gunshot wound to the heel and the bullet which grazed Leake's neck were not considered lethal as they would not have caused Leake's death. (TT 145, 147) Two bullets were recovered from the victim's body and sent to ballistic experts for analysis. (TT 148) Dr. Shakir testified that, in his opinion and within a reasonable degree of medical certainty, the cause of death was gunshot wounds to the head and chest and the manner of death was homicide. *Id.*

Clifton Pugh, a Pittsburgh Police Detective for 21 years, testified that on August 14, 2011 he was assigned to investigate the death of Antwon Leake and was one of the first detectives to arrive on the scene. (TT 154) Detective Pugh testified that numerous pictures were taken of the crime scene at 315 Rochelle Street. (TT 158) In one of those pictures, a black semi-automatic handgun protruded from Leake's waist on his left side. (TT 170)

Kiona Sirmons testified that 315 Rochelle Street was the home of her cousin, Elizabeth Macklin. (TT 182) She stated that she was a frequent guest of the home and was present on August 14, 2011. She had a key to the house and had gone there to retrieve some personal items. (TT 186) While she was there, she called some friends to come over, Ravin Reid and Montaja Littlejohn. *Id.* Ravin and Montaja came over, and Montaja brought Valon Pennix, Montaja's friend, to the residence. (TT 189) Some time later, Leake arrived with Jacelyn Terry. (TT 190) Jacelyn stayed in the living room with the other women, but Leake went to the kitchen. *Id.* Sirmons testified that she and Leake were dating. (TT 192) Between the time Leake entered the house and the time she heard gunshots, she testified that she did not see anyone else come into the house. (TT 199) She testified that she grew up with Jarod Cager and knew Terrel Noaks to see him in the neighborhood. (TT 208)

Contrary to her trial testimony, Sirmons previously identified Cager and Noaks as the two men she saw fleeing from the house. Sirmons was interviewed by the police on the night of the shooting, and again on September 2, 2011. (TT 199, 202) On September 9, 2011, Sirmons gave a recorded statement to the police. (TT 243) In the recorded statement, which was published to the jury, Sirmons

4

indicated that Noaks and Cager ran out of the house shortly after the shooting. (TT 240). She identified Noaks and Cager from a series of photographs. (TT 242)

At trial, her testimony on direct examination varied substantially from the recording. She testified that she did not see who ran out of the house after the shooting. (TT 242) She said that she identified Cager and Noaks as the shooters because Detective McGee "was getting on my nerves so I told him anything." (TT 205) She first testified that the police never showed her any photographs. (TT 212) Later, she testified that the police did show her a photo array but told her who to circle. (TT 254) She denied telling the police the nicknames for Cager and Noaks. (TT 208, 210)

Homicide Detective James McGee testified that he interviewed Sirmons on September 2, 2011. (TT 292) Detective McGee testified that Sirmons told him she was at her aunt's house with her girlfriends and Leake. (TT 293-294) She told the Detective that approximately 15 minutes after Leake arrived, two black males walked into the house and proceeded to the kitchen where Leake was. (TT 294) She assumed they were friends of Leake. Id. Two or three minutes later, she heard multiple gunshots. (TT 295) She saw two people she knew as Hot Rod and Tido[2] running from the kitchen area out the front door. Id.

Next, Valon Pennix testified that she had little recollection of the specifics of September 2, 2011. She claimed that people she did not know entered and exited the house. (TT 329) She heard one or more male voices that she did not recognize. (TT 330) She further claimed that she did not remember her interview with the police or her meeting with officers and the Assistant District Attorney ("ADA") the previous week. She denied ever telling police that two men other than Leake entered the house on September 2nd. (TT 388) She denied that she told authorities that these two

---

[2] Sirmons testified at trial that "Hot Rod" referred to Cager and "Tido" referred to Noaks. (TT 247, 255)

men went to the back of the house where the kitchen was and ran out of the house after shots were fired. (TT 389)

Detective Pugh resumed the stand and testified that in February 2013 Pennix met with the ADA and two detectives, including himself. (TT 395) She stated at that time that on the night in question, two males, one whose name was Hot Rod, were in the home before Leake arrived. (TT 396) Leake arrived with Jacelyn and he went to the kitchen while Jacelyn stayed in the living room. (TT 397) Approximately a minute later, the two males also went into the kitchen area. *Id.* Pennix stated she heard approximately ten gunshots and hid until she heard Kiona's voice. *Id.*

Ravin Reid testified that she was on the couch at 315 Rochelle Street on August 14, 2011 when she heard four or five gunshots coming from the kitchen where she earlier saw Leake go. (Jury Trial Transcript, Volume II, hereinafter TT2 at 19-21) She did not see any other males arrive at the house. (TT2 20) After she heard the shots, she hid in the attic with Valon and Kiona until police arrived. (TT2 24-25)

Jacelyn Terry testified similarly. She stated that she was in the living room, and Leake was in the kitchen. (TT2 42-43) She heard gunshots. (TT2 48) Kiona walked into the kitchen, started screaming and called the police. *Id.* The police told her to go upstairs and Jacelyn went to the attic with Kiona. *Id.* She claimed she not see any males other than Leake in the house. (TT2 49)

Pittsburgh Police Detective Christopher Mayburn helped secure the scene and observed the emotional state of the young women in the attic. (TT2 74) He described them as hysterical and screaming. *Id.* He testified that one of the females said two men with guns left the house. (TT2 75)

Detective Pugh resumed the stand again and described the crime scene as he first observed it. (TT2 93) On his initial walk-through, he observed shell casings near Leake's body and a bullet hole in the cabinet door. (TT2 95) The front door was open and the side and back doors were closed and locked with deadbolts. (TT2 101) Eight bullet casings were recovered from the scene: four .357

6

caliber Sig Sauer casings and four Smith and Wesson casings. (TT 105) Detective Pugh also observed gouges in the floor beneath the left and right foot of the victim. (TT2 110) A damaged bullet was also recovered from the basement directly below the kitchen. (TT2 116-117) The victim was holding a cell phone in his right hand which was under his body. (TT2 120) A loaded Smith and Wesson semiautomatic pistol was tucked into the victim's waistband. (TT2 121)

Blase Kraeer, a City of Pittsburgh Detective assigned to the Mobile Crime Unit, testified as a mobile crime expert. (TT2 145-146) He testified that he and Detective Jozwiak were dispatched to 315 Rochelle Street to process a crime scene. (TT2 146) He took photographs of the entire area and collected physical evidence, including the victim's gun and several bullet casings. (TT2 147-148) He also observed and photographed several bullet strikes on the floor of the kitchen, including one or two areas where a bullet completely penetrated through the floor. (TT2 149)

Joseph Bielevicz testified that as part of his employment as a Detective with the City of Pittsburgh on permanent detail to the Bureau of Alcohol, Tobacco and Firearms, he was investigating an individual named Tanner Shawl on an unrelated matter. (TT 2 184) Based on his conversation with Shawl, Bielevicz contacted Detective Pugh and informed him that he may wish to question Shawl regarding the investigation into Leake's death. (TT2 188)

After interviewing Shawl, Detective Pugh gained information relative to this case. At trial, Shawl testified that in December 2010 he travelled to a gun store in West Mifflin to purchase a firearm for Cager. (TT2 205-206) Shawl had known Cager for a year or two prior to the purchase. (TT2 206) Cager and Shawl discussed the idea of purchasing a gun on several prior occasions before Shawl finally relented. (TT2 207) Cager and Shawl went into the store together and Cager identified to Shawl which gun he wanted. (TT2 209) Both men left the store together and Cager gave Shawl approximately $500.00 while they were in the car. *Id.* Shawl returned to the store and purchased the

7

gun that Cager had selected, a .40-caliber Glock handgun. *Id.* Shawl gave the Glock to Cager and drove him home. (TT2 219)

During the investigation into the Leake homicide, Pittsburgh Police Detective Scott Evans testified that he Mirandized Cager and afterward Cager provided his cell phone number as 412.315.7243. (TT2 243-244) Pittsburgh Police Officer Paul Able testified that he subsequently arrested Cager on this case, recovered two cell phones from him, and gave these phones to Detective Lang. (TT2 333) City of Pittsburgh Officer Cynthia Smith testified that she arrested Noaks and after she Mirandized him, he gave her personal information including his cell phone number, which he stated was 412.277.3888. (TT2 336)

Debra Tator, a scientist with the Allegheny County Medical Examiner's Office, testified as an expert in the field of firearms and tool marks evaluation. (TT2 276) She tested four cartridge casings stamped FC .357 SIG which were recovered from the crime scene and determined that they were all discharged from the same firearm. (TT2 286) Based on comparison with the crime lab database, these casings were determined to match casings recovered from other crime scenes. (TT2 287) She also tested four .40 S&W casings stamped RP and an additional casing similarly marked but collected and packaged separately. (TT2 288) She determined that all five casings had been fired from the same weapon, and that weapon was a Glock. (TT2 289-290) The casings also matched the .40 caliber bullets recovered from the victim's head and chest. (TT2 295-296) Other lead fragments removed from Leake at the autopsy were unsuitable for comparison purposes. (TT2 298) Leake's gun was also test-fired and the test casings were entered into the same database. It was determined that both his gun and the gun used to kill him had been used at another crime scene on July 31, 2011. (TT2 319)

Robert Levine, the manager of the firearms and tool marks section of the Allegheny County Office of the Medical Examiner, testified as an expert in the field of firearms evidence. (TT2 323)

8

He examined Leake's clothes and determined based on the relative presence or absence of gunpowder residue that Leake had been shot from a distance of three to four feet away. (TT2 327)

Joseph Cirigliano, at the time of this homicide investigation a Pittsburgh Police Detective attached to the Mobile Crime Unit, testified that he tested the spent casings and damaged bullet recovered from the scene for latent prints. (TT2 344) He did not recover any fingerprints but testified that failure to recover prints from casings and bullet fragments is not unusual. (TT2 345) He further testified he ran the black Smith and Wesson revolver recovered from Leake and it came back as stolen out of Butler County on December 18, 2009.

The parties stipulated that neither Cager nor Noaks was licensed to carry a firearm, and neither could have obtained one based on their ages. (TT2 347) The parties further stipulated that detective's retrieved data from cell phones recovered from Cager upon his arrest. (TT2 348)

Lyle Graber, a police officer with the Allegheny County District Attorney's Office, testified as an expert witness in the field of cell phone data analysis. (TT2 366) He testified that he analyzed the cell phone records for the number that Cager provided police when he was arrested. (TT2 367) Graber also testified that he had the cell records of the phone number associated with Leake. (TT2 369) In addition, he analyzed a "data dump" on Leake's phone, which included all of the information contained in Leake's phone at the time it was obtained. *Id.* Graber testified that four calls were made between 412.295.0415 (Cager) and 412.312.0304 (Leake) on the day Leake died. (TT2 382) All of the calls originated from Leake's phone. (TT2 383) The first call was made at 1:38 p.m. and lasted one second. *Id.* The next call was seven seconds later and lasted two seconds. (TT2 384) The third call was placed at 1:26 a.m. and had a duration of two minutes and 44 seconds. *Id.* The fourth call occurred and 2:07 a.m. and lasted five minutes and 41 seconds. *Id.*

Graber further testified that the records indicated several calls between Cager and Noaks (412.277.3888). (TT2 385) The first call from Noaks to Cager on August 13, 2011 occurred at 11:12

9

a.m. and lasted three seconds. (TT2 386) The next call was at 11:43 a.m. and lasted three seconds. *Id.* The third call was at 12:02 p.m. and was three seconds in duration. *Id.* The fourth call was at 12:03 p.m. and lasted two seconds. *Id.* The fifth call occurred at 1:19 p.m., and lasted one second. *Id.* Graber also testified that four calls from Cager's phone on August 14, 2011 between 6:00 p.m. and 8:06 p.m. utilized cell tower 059. (TT2 395) Tower 59 is situated in the same general area as the murder site and Cager's mother's home. (TT2 414)

## DISCUSSION

Appellant alleges this Court erred in denying a motion for an expert witness on eyewitness identification. Appellant cites *Commonwealth v. Walker*, 92 A.3d 766 (Pa. 2014), (permitting eyewitness expert testimony under certain circumstances) in support of his position that this Court abused its discretion and as a result Appellant suffered prejudice. This Court decided Appellant's motion on October 29, 2012[3], two years before *Walker* was decided.[4] Appellant, in his Brief in Support of Motion to Appoint an Expert Witness, acknowledges that at the time of trial, Pennsylvania had a *per se* bar against this type of expert testimony. (Brief in Support of Motion to Appoint an Expert Witness, 10/25/12, unnumbered but at pp. 21-22)

---

[3] This Court notes that the record is incomplete on this Motion's Hearing for unknown reasons. The transcript of the October 29, 2012 proceeding appears to indicate discussion of that Motion at some earlier point during that hearing. However, that discussion is not contained in the record. (Transcript of Motions hearing on October 29, 2012, hereinafter MT, at 2) After a brief discussion on an unrelated issue, counsel for Cager asks if the motion for the expert witness is denied and this Court stated that it was denied. (MT 6)

[4] This Court further notes that *Walker* was remanded to the trial court for it to determine through a *Frye* hearing whether the methodology used in that case was generally accepted by scientists in the relevant field, leaving open questions of relevance and probative value. *Id.* at 790. At a minimum, this Court would have to make the same inquiry.

10

Furthermore, of the five potential eyewitnesses in the house at the time of the killing, none testified at trial that they saw anyone run past them after shots were fired. Kiona denied seeing the men who exited the building after the shooting. Valon stated she could not remember anything about the shooting, including her statement to the police. Ravin and Jacelyn testified that they hid in the attic, and Montaja did not testify at all. Since none of the witnesses made an identification at trial, the value of the proposed expert testimony was diminished substantially.

Appellant next alleges that this Court erred in denying Appellant's request for information regarding the shooting death of Jason Daniels. Appellant alleges the unsolved homicide investigation related to Daniels and the killing of Leake in this case are related in some fashion. Trial counsel for Noaks had interviewed Stephanie Peebles, Daniels' cousin, who said that shortly before Leake's death, Daniels asked Peebles to participate in a robbery of Leake. She said Daniels mentioned something about drug debts or possibly guns. Peebles declined to participate. Daniels later told Peebles to look at the news, where she discovered that Leake had been killed. The next day Daniels told Peebles everything was fine, but Daniels was killed shortly thereafter. Peebles said the word on the street was that Daniels killed Leake, then Leake's friends killed Daniels. The two murders occurred within 24 hours of each other and the crime scenes were within walking distance of one another.

This Court held an *in camera* review of the Daniels homicide police investigatory file and interviewed the Detectives investigating the Daniels case before denying Appellant's motion. Detectives Pugh and Boose stated *In camera* that Cager and Noaks killed Leake over drugs that Leake stole from Noaks that belonged to Cager. Two of the five young women present at the time of Leake's shooting were interviewed and identified Cager and Noaks. Despite witness reluctance to cooperate (as subsequently observed by this Court during trial where significant efforts were made

11

to intimidate witnesses who were called to testify),[5] the witness identifications of Cager and Noaks were solid, had been made by two people present at the scene, at least one of whom had known both men most of her life, and included knowledge of their nicknames and descriptions of each as young African-American men. Both ballistic evidence and cell phone records supported the eyewitness identifications of the two men charged in this case. In contrast, the Daniels investigation uncovered a single suspect who was described as a white, Italian or Hispanic male wearing camouflage clothing. The physical description matched a suspect named Rashad Watson, whom the police interviewed but who was at large at the time. This Court did not find evidence in the ongoing investigation of Daniels' murder that would in any way connect it to Leake's murder and determined that the potential of compromising that ongoing investigation by disclosing police sources was significant. As such, this Court properly denied the Motion.

Appellant's next allegation of error is that this Court admitted color photographs of the autopsy which were more prejudicial than probative. "Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision on such a question absent a clear abuse of discretion." *Commonwealth v. Maloney*, 876 A.2d 1002, 1006 (Pa.Super.2005). An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result

---

[5] The trial transcript does not begin to reflect the tension in the packed courtroom and the significant problems this Court had controlling the crowd. This trial required the use of additional deputies both inside and outside the Courtroom as groups of individuals with no apparent ties to the case filled the Courtroom while Commonwealth witnesses testified. On several occasions, individuals were observed making threatening gestures and otherwise behaving in ways that appeared to be clearly intended to intimidate witnesses. (*See, e.g.* TT 352) Regularly, observers took turns leaving the Courtroom to go into the stairwell where they would send text messages before returning to the Courtroom. Ultimately, this Court had to caution that, if observers left the room during testimony, they would not be permitted to return until the next recess as the disruptions were creating a distraction to the jury.

12

of bias, prejudice, ill-will or partiality, as shown by the evidence or the record. *Commonwealth v. Cameron*, 780 A.2d 688, 692 (Pa.Super.2001).

This Court carefully exercised its discretion. Although the Court's precautionary measures could not completely sanitize the inflammatory nature of the photographs, such is not the test for admissibility. This Court reviewed each photograph individually and correctly applied the two-part test to each photograph. This Court then admitted only those crime scene photographs that it did not find to be inflammatory and autopsy and crime scene photographs that, while potentially inflammatory, had evidentiary value the Court found to be "essential." *Commonwealth v. Ballard*, 80 A.3d 380, 393–94 (2013). Of the photographs this Court found inflammatory, it admitted only those deemed necessary to explain to the jury the nature of the crime and allow the Commonwealth to meet its burden of proof. Redundant and unnecessarily gruesome photographs were excluded. This Court gave a cautionary instruction regarding these photographs, both before they were admitted and in the charge. (TT 131-132, TT2 595) This Court acted within its discretion, and within the bounds of the decisional law governing this type of photographic evidence.

Turning to Appellant's next allegation of error, Appellant alleges this Court erred in permitting the Commonwealth to play the recorded statement of Kiona Sirmons. Appellant alleges that homicide detectives led Sirmons throughout her recorded interview. The applicable rule of evidence is Rule 613 (b), which states:

Rule 613. Witness's Prior Inconsistent Statement to Impeach; Witness's Prior Consistent Statement to Rehabilitate

(a) Witness's Prior Inconsistent Statement to Impeach. A witness may be examined concerning a prior inconsistent statement made by the witness to impeach the witness's credibility. The statement need not be shown or its contents disclosed to the witness at that time, but on request the statement or contents must be shown or disclosed to an adverse party's attorney.

13

(b) Extrinsic Evidence of a Witness's Prior Inconsistent Statement. Unless the interests of justice otherwise require, extrinsic evidence of a witness's prior inconsistent statement is admissible only if, during the examination of the witness,

(1) the statement, if written, is shown to, or if not written, its contents are disclosed to, the witness;
(2) the witness is given an opportunity to explain or deny the making of the statement; and
(3) an adverse party is given an opportunity to question the witness.

Pa.R.E. 613

The recorded statement was admitted as a prior inconsistent statement. Appellant alleges the Detective's questions were improperly leading. Upon review of the transcript of the police interview with Sirmons, it is clear in context that the Detective already had interviewed her and was asking questions to allow her to confirm important details and summarize her prior off the record statements. The statements in the recorded interview are admissible to allow the jury to compare the credibility of the witness at trial versus the credibility of the witness on an earlier occasion. Appellant's objection goes to the weight, and not the admissibility, of the evidence. "Our courts long have permitted non-party witnesses to be cross-examined on prior statements they have made when those statements contradict their in-court testimony." *Commonwealth v. Carmody*, 799 A.2d 143, 148 (Pa. Super. 2002).

Appellant alleges that this Court erred in permitting testimony regarding Tanner Shawl purchasing a firearm for Appellant. Appellant alleges the testimony of Shawl and Detective Joseph Bielecivz on this matter was irrelevant and highly prejudicial. Pa.R.E. 402 provides that generally, "[a]ll relevant evidence is admissible" and "[e]vidence that is not relevant is not admissible." Furthermore, Pa.R.E. 401 provides the following test for relevancy:

Evidence is relevant if:
(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
(b) the fact is of consequence in determining the action.

14

Pa.R.E. 401.

Thus, the basic requisite for the admissibility of any evidence in a case is that it be competent and relevant. *Commonwealth v. Freidl*, 834 A.2d 638, 641 (Pa.Super.2003). Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. *Commonwealth v. Barnes*, 871 A.2d 812, 818 (Pa.Super.2005). Though relevance has not been precisely or universally defined, the courts of this Commonwealth have repeatedly stated that evidence is admissible if the evidence logically or reasonably tends to prove or disprove a material fact in issue, tends to make such a fact more or less probable, or affords the basis for or supports a reasonable inference or presumption regarding the existence of a material fact. *Freidl*, 834 A.2d at 641.

The testimony of Detective Bieleciyz and Tanner Shawl established that, prior to Leake's murder, Tanner Shawl illegally obtained a weapon for Cager, a .40 caliber Glock handgun, a firearm consistent with ballistic evidence at the scene of this homicide. As part of a case based partially on circumstantial evidence, the fact that Cager possessed an illegally obtained firearm that matched the bullets found at the crime scene, while not dispositive in and of itself, certainly makes it more likely he committed the murder. As such, the evidence is relevant and this Court did not abuse its discretion in admitting it.

Appellant alleges that the verdicts were against the weight of the evidence because no witness testified under oath that Appellant was at the scene, the ballistic and cell phone testimony and evidence presented at trial did not establish Appellant's presence at the scene. The standard for a "weight of the evidence" claim is as follows:

> Whether a new trial should be granted on grounds that the verdict is against the weight of the evidence is addressed to the sound discretion of the trial judge, and [her] decision will not be reversed on appeal unless there has been an abuse of discretion.... The test is not whether the court would have decided the case in the same way but whether the verdict is so contrary to the evidence

15

as to make the award of a new trial imperative so that right may be given another opportunity to prevail.

*Commonwealth v. Taylor*, 471 A.2d 1228, 1230 (Pa.Super. 1984). *See also, Commonwealth v. Marks*, 704 A.2d 1095, 1098 (Pa.Super. 1997) (citing *Commonwealth v. Simmons*, 662 A.2d 621, 630 (Pa. 1995)).

The verdicts were not against the weight of the evidence. Two witnesses identified Cager and Noaks to the police shortly after the killing. The jury could reasonably conclude that the witnesses' subsequent retraction and claim of memory loss were the result of obvious attempts at witness intimidation. Furthermore, a reasonable interpretation of the evidence by the jury is that Appellant was in the area at the time of the killing (based on the cell phone evidence) and that he had previously obtained a weapon that matched one of the murder weapons (based on the testimony of Detective Bielecivz and Tanner Shawl). Based on the above, a jury could reasonably conclude that Appellant not only possessed a firearm but used it to kill Leake.

Appellant alleges that the evidence was insufficient to establish guilt beyond a reasonable doubt on both counts. The test for reviewing a sufficiency of the evidence claim is well settled:

> [W]hether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner and drawing all proper inferences favorable to the Commonwealth, the jury could reasonably have determined all elements of the crime to have been established beyond a reasonable doubt... This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt.

*Commonwealth v. Hardcastle*, 546 A.2d 1101, 1105 (Pa. 1988) (citations omitted).

Appellant was convicted of Murder in the First Degree, which is defined as:

§ 2501. Criminal homicide

(a) Offense defined.--A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being.

18 Pa.C.S. § 2501.

§ 2502. Murder

16

(a) Murder of the first degree.--A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

18 Pa.C.S. § 2502.

The element distinguishing first-degree murder from all other degrees of murder is willful, premeditated, and deliberate intent to kill, which can be proven by circumstantial evidence. *Commonwealth v. Wilson*, 672 A.2d 293, cert. denied 519 U.S. 951. "[T]he jury is free to believe all, part, or none of the evidence presented at trial." *Commonwealth v. Gonzalez*, __A.3d__, 2015 WL 252446 (Pa. Super. 2015). The evidence was sufficient for the jury to find Appellant guilty of first degree murder. According to the testimony, two men entered the house, proceeded directly to the kitchen and shot Leake multiple times, causing his death. Two eyewitnesses identified Cager and Noaks as running out of the kitchen immediately after shots were fired. Ballistic evidence from the crime scene matched a gun Cager had obtained illegally. Cell phone records put Cager and Noaks in proximity to the crime at the time of its commission. These facts, taken together, suffice to establish the basis for Appellant's conviction for Murder in the First Degree.

Lastly, Appellant alleges that the Commonwealth failed to prove beyond a reasonable doubt the Carrying a Firearm Without a License charge. Carrying a Firearm Without a License is defined as:

§ 6106. Firearms not to be carried without a license

(a) Offense defined.—

(1) Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

18 Pa.C.S. § 6106(a).

The parties stipulated that Cager was a person unable to lawfully possess a firearm. Tanner Shawl testified that he had purchased a gun with Cager's money and handed it to Cager

in Shawl's car immediately after purchase. Eyewitness identification, cell phone evidence and ballistic evidence from the crime scene tie Cager and that, or a very similar gun, to the murder. These facts suffice to establish the crime of Carrying a Firearm Without a License.

## CONCLUSION

For all of the above reasons, no reversible error occurred and the findings and rulings of this Court should be AFFIRMED.

BY THE COURT:

Jill E. Rangos                    J.

JILL E. RANGOS

18

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of this OPINION was mailed to the following individuals by first class mail, postage prepaid on the 2nd day of August, 2016.

A. Kayleigh Shebs
Office of Conflict Counsel
429 Forbes Avenue, Suite 1405
Pittsburgh, PA 15219

Michael Streily
Office of the District Attorney
401 County Courthouse
436 Grant Street
Pittsburgh, PA 15219

James J. Robertson, Law clerk for Jill E. Rangos

19